UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GARY D. QUINN II, <br><br> Plaintiff, <br><br> v. <br><br> JOHN MAY, ALLISON BEATTY, MITESHKUMAR MODI, NICOLE LASAK and ARMOR CORRECTIONAL HEALTH SERVICES, INC., <br><br> Defendants. | Case No. 17-cv-05402 <br><br> Hon. Charles R. Norgle |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Gary D. Quinn II, ("Mr. Quinn"), by his undersigned counsel, respectfully submits this Response in Opposition to Defendants Dr. John May ("May"), Allison Beatty ("Beatty"), Nicole Lasak ("Lasak"), and Armor Correctional Health Services, Inc.'s ("Armor") Motion for Summary Judgment and to Defendant Miteshkumar Modi's ("Modi") Motion for Summary Judgment, and their Memorandums in Support thereof.

**I.     INTRODUCTION**

A prior inmate at Lake County, Mr. Quinn brings this civil rights action under 42 U.S.C. § 1983 to obtain relief for the Defendants' failure to promptly and adequately address Mr. Quinn's chronic and severe health impairments.  Mr. Quinn, a victim of multiple gunshot wounds just prior to his booking at Lake County, suffered severe and ongoing body and nerve pain.  He was in desperate need of treatment that could only be given to him by an outside specialist, yet his repeated requests to be transported outside the facility were dismissed.  It took more than eight months for Mr. Quinn to receive necessary surgery.  During that time period, Mr. Quinn's

1

complaints of severe pain were repeatedly ignored. His requests for other accommodations were improperly denied without explanation despite being approved later.

By this lawsuit, Mr. Quinn seeks recovery under the Eighth Amendment of the United States Constitution for the Defendants' deliberate indifference to his medical needs. The Defendants' Motions for Summary Judgment are unfounded and should be rejected. Mr. Quinn has come forward with facts demonstrating that Defendants were deliberately indifferent to his serious medical condition, and that Armor maintains a widespread practice of violating its own policies and procedures concerning the healthcare of inmates.

## II. RELEVANT BACKGROUND FACTS

On January 5, 2018, Mr. Quinn brought this Section 1983 action against the Defendants alleging that their refusal to provide proper medical care for Mr. Quinn's serious physical health ailments constituted deliberate indifference in violation of the Eighth Amendment. (PSOF ¶ 40.) In September 2016, Mr. Quinn received gunshot wounds to his right hip, left hip, stomach, chest, and right forearm, causing him to walk with a limp, frequently use a cane, and wear braces to prevent foot drop and assist with right arm motion. (PSOF ¶ 1.) He suffered extensive organ and nerve damage, including severe impairment to his spinal sciatic nerve, which results in chronic and frequent swelling in his legs. (*Id.*) Prior to his booking at Lake County, Mr. Quinn received multiple surgeries and procedures to ameliorate his injuries. (PSOF ¶ 2.) Mr. Quinn's surgeries went well; he reported to his doctors that he was not suffering unordinary pain. (*Id.*) Mr. Quinn attended several biweekly post-op evaluations and orthotic rehabilitative treatments for his hand and arm, and was informed by his doctors that, as long as he continued with physical therapy and continued to attend check-ups concerning the status of his nerves, Mr. Quinn would be able to further improve his condition. (*Id.*)

On March 11, 2017, Mr. Quinn was admitted to Lake County. (PSOF ¶ 3.) During his Patient Intake Health Screening upon booking, it was recommended that Mr. Quinn be placed in medical housing in light of his serious injuries. (*Id.*) Inmates who have suffered serious wounds or who have undergone recent surgeries are typically evaluated to determine whether he or she requires additional medical treatment and placed somewhere other than the general population. (*Id.*) On or about one week after his arrival to Lake County, Mr. Quinn notified Armor personnel that the thin prison mattress caused him additional, severe pain due to his medical condition, and he requested an additional mattress. (PSOF ¶ 4.)

Mr. Quinn was released to the general population by Defendant May. (DSOF ¶ 5.) May evaluated Mr. Quinn during his initial health screening. (*Id.*) He authorized Mr. Quinn to use jail-provided worker shoes for support, which did not fit over Mr. Quinn's ankle brace. (*Id.*) The prison shoes caused Mr. Quinn to suffer painful cuts and sores over the course of several months. (*Id.*)

On March 28, 2017, Mr. Quinn saw Modi for his initial healthcare visit. (PSOF ¶ 7.) During the visit, Mr. Quinn again raised concerns about the prison mattress. (*Id.*) Mr. Quinn also informed Modi that the jail-issued shoes did not fit his brace properly. (*Id.*) Mr. Modi evaluated Mr. Quinn and noted his extensive injuries, but nevertheless denied Mr. Quinn's request for an additional mattress, informing Mr. Quinn that he did not "meet the criteria." (*Id.*) Armor policy requires that inmates "have a significant medical issue" with a "significant medical history" to be granted an additional mattress. (PSOF ¶ 8.) Requests for additional mattresses are evaluated by an inmate's medical provider to determine whether the second mattress is medically necessary. (*Id.*)

On or about the date of Mr. Quinn's initial visit with Modi, Mr. Quinn told Armor personnel that he had follow-up appointments scheduled with his doctors at Froedert Hospital. (PSOF ¶ 9.) Mr. Quinn attempted to have paperwork dropped off regarding the appointments, but his efforts and inquiries as to these appointments were dismissed. (*Id.*) Therefore, on April 13, 2017, Mr. Quinn submitted a Sick Call Slip, stating that Mr. Quinn had missed his follow-up appointment, that the hardware in his right arm needed to be removed, and that Mr. Quinn wanted to be seen by May. (*Id.*) Mr. Quinn was seen by an Armor nurse on April 20, 2017, but records show that Mr. Quinn was told that he could not be transported to Froedert Hospital, and that he would need to obtain a referral from Modi to be connected with a nearby outside provider. (*Id.*)

On April 26, 2017, Mr. Quinn submitted another Sick Call Slip, reporting severe pain from the loose hardware in his right elbow. (PSOF ¶ 11.) During the visit, Armor personnel noted that Mr. Quinn was suffering severe pain, and that he felt his pain medications were not helping. (*Id.*) Mr. Quinn's nurse that day learned after speaking with Froedert Hospital that Mr. Quinn had missed a follow-up appointment for removal of the loose hardware in his elbow. (*Id.*) The nurse spoke to Mr. Modi, who was to request an orthopedic consult. (*Id.*)

Mr. Quinn saw Modi two more times in May 2017 for severe pain in his right elbow and his lower body due to nerve damage. (PSOF ¶¶ 12, 13.) Despite evaluating Mr. Quinn's injuries and noting his complaints of severe pain, Modi again denied his request for a double mattress, and his request to see Defendant May, claiming this "require[d] a referral." (PSOF ¶ 13.) According to May, however, a referral was not required for him to see patients while he was present at the facility. (*Id.*)

May refused to treat Mr. Quinn despite Mr. Quinn asking his nurse, Modi, and May on at least four separate occasions. (PSOF ¶¶ 9, 13, 14, 15.) May ignored Mr. Quinn's attempts to

4

receive his care. (PSOF ¶¶ 14, 15.) Indeed, Mr. Quinn testified that while being treated by Modi, May entered the office, but ignored his healthcare questions, claiming he was too busy to speak with him. (PSOF ¶ 14.) Mr. Quinn further testified that both Defendants informed Mr. Quinn that "they c[ould] only do so much" for him, even though Mr. Quinn communicated to both Defendants that he was "only asking for him [i.e., Dr. May] to verify that [he] needed to go out to see my other doctors or if they had already assigned me a doctor to go see, because [he] was still undergoing a lot of pain." (*Id.*) Mr. Quinn also testified that he approached May in the healthcare unit on an additional occasion, but May "said that he had [Mr. Quinn's] file and he didn't need to see [him]." (PSOF ¶ 15.)

At this point, Mr. Quinn had been denied treatment by his outside providers at Froedert Hospital and by May, the only certified medical doctor at the facility. Indeed, Modi testified that he could only "examine" and refer patients with abnormalities caused by gunshot wounds -- such as Mr. Quinn's loose hardware -- to specialists for actual treatment. (PSOF ¶ 9.) It was not until June 12, 2017 (three months after being admitted to Lake County) that Mr. Quinn was referred to an orthopedic surgeon, Dr. Cavallero, for his right elbow fracture, right ulnar nerve injury, and right foot drop. (PSOF ¶ 16.) Dr. Cavallero personally requested that Mr. Quinn be permitted to use his personal shoes to help his leg condition. (*Id.*) Upon Mr. Quinn's return to Lake County, it was noted by Armor personnel that the recommendation be discussed with Modi. (PSOF ¶ 17.) Nevertheless, Modi denied the recommendation the following the day. (PSOF ¶ 18.) On June 21, 2017, Mr. Quinn was finally granted permission to use his personal shoes after making a third request to Defendant Modi. (PSOF ¶¶ 22, 23.)

Beginning in June 2017, Mr. Quinn filed two grievances concerning his need for an additional mattress due to his chronic nerve pain and, after his request was again rejected on June

5

26, 2017, Mr. Quinn was finally given the additional mattress on October 3, 2017 -- *nearly **seven months*** after his first request. (PSOF ¶¶ 19, 25, 36.) Mr. Quinn filed an additional grievance on August 21, 2017 concerning the fact that he had not yet seen a hand specialist. (PSOF ¶ 32.) It was not until November 14, 2017 that Mr. Quinn received surgery -- more than ***eight months*** after his arrival to Lake County. (PSOF ¶ 37.)

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, all evidence and inferences must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). The court may not weigh the evidence and may not make credibility determinations. *McCann*, 622 F.3d at 752. Nor can it make a determination as to which party's version of the facts is more likely to be true. *Id.* A non-movant is able to survive summary judgment if it can produce material factual disputes that might impact the outcome of the lawsuit. *CMBB LLC v. Lockwood Mfg., Inc.*, 628 F. Supp. 2d 881, 882-83 (N.D. Ill. 2009).

### IV. ARGUMENT

To establish an Eighth Amendment claim for denial of appropriate medical care, a plaintiff must demonstrate (1) that he or she suffers from a serious medical condition and (2) that the defendant was deliberately indifferent to that condition. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). While the first prong is an objective standard, the second prong is a subjective standard. *Id.* Defendants assert that Mr. Quinn is unable to demonstrate a question of fact as whether the defendants were deliberately indifferent to his serious medical condition. As detailed below,

6

however, genuine issues of material fact exist as to this element and, accordingly, the Defendants' Motions for Summary Judgment should be denied.

### A. Each Individually Named Defendant was Deliberately Indifferent to Mr. Quinn's Serious Medical Condition

To make a showing of deliberate indifference, "it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "This is not to say that a prisoner must establish that officials intended or desired the harm that transpired." *Id.* [A] prisoner is *not* required to show that he was literally ignored." *Id.* (internal quotation marks and citation omitted) (emphasis added). Rather, a plaintiff must show that "the communication, in its content and manner of transmission, gave the defendant sufficient notice to alert him or her to an 'excessive risk to inmate health or safety.'" *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). Delay of necessary treatment and thus aggravating the injury or needlessly prolonging an inmate's pain has been found to constitute deliberate indifference. *Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012) (four day delay in treatment constituted deliberate indifference where it caused "prolonged, unnecessary pain"); *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) ("[e]ven a few days' delay in addressing a severely painful but readily treatable condition constitutes deliberate indifference"); *Greeno v. Daley*, 414 F.3d at 653-54 (vacating district court's order granting summary judgment where prison doctor refused to alter his treatment plan despite plaintiff's continued complaints that his condition was worsening). Even "continuous medical treatment" is not sufficient in itself for a defendant to prove that it was not deliberately indifferent. *Sherrod v. Lingle*, 223 F.3d 605, 611-12 (7th Cir. 2000).

There is no question that Defendant Modi knew of the substantial risk of harm that could result if Mr. Quinn's physical conditions and severe pain went untreated. Modi examined Mr. Quinn on five separate occasions (PSOF ¶¶ 7, 12, 13, 22; DSOF ¶ 48.) Modi's own notes make

7

clear that he was aware of Mr. Quinn's medical condition, various injuries and medical history, that Mr. Quinn communicated to Modi during those visits that he was suffering from severe and chronic pain, and that his pain medication was not helping. (PSOF ¶¶ 7, 11, 12, 13, 22, 27; DSOF ¶ 48.)

Modi disregarded Mr. Quinn's medical needs when he delayed Mr. Quinn access to an additional mattress, personal shoes, and medical treatment that could only be properly rendered by an outside provider or, alternatively, Defendant May. Mr. Quinn communicated his concerns regarding the negative effects the prison mattress had on the injuries to his nerves during his initial visit with Modi on March 28, 2017. (PSOF ¶ 7.) Mr. Quinn did not receive the additional mattress until *nearly **seven months later*** -- after raising concerns about the mattress to Defendant Modi on at least three separate occasions, and after filing several grievances regarding those concerns. (PSOF ¶¶ 7, 8, 13, 19, 22, 24, 25, 36.) In addition, Mr. Quinn notified Modi during his initial visit that the jail-issued shoes did not fit over his brace. (PSOF ¶ 7.) It was not until approximately ***three months later*** on June 21, 2017, and after Dr. Cavallero had to personally request that Armor permit him to use his personal shoes, that Mr. Quinn's requests were taken seriously, and that his personal shoes were finally approved. (PSOF ¶¶ 7, 16, 23.) Most critically, Modi did not order an orthopedic referral until seeing him for the ***fifth*** time (and nearly three months after his initial visit with Modi), despite knowing that Mr. Quinn's elbow hardware needed to be removed, receiving an inquiry from Mr. Quinn about when he would begin physical therapy, and despite that the nerve damage to his body (namely, his hand) needed to be assessed by someone who could actually treat him. (PSOF ¶¶ 9, 14, 17, 22, 27.) He refused Mr. Quinn's attempt to see May, claiming a referral was required when, in realty, it was not, and also ignored Mr. Quinn's inquiries about seeing an outside provider. (PSOF ¶¶ 13, 14, 22.)

8

Defendant May was also deliberately indifferent to Mr. Quinn's serious medical condition. He was aware of Mr. Quinn's injuries when he examined Mr. Quinn during his initial health screening, which took place shortly after the intake process. (PSOF ¶ 5.) It was initially recommended that Mr. Quinn be placed in medical housing. (PSOF ¶ 3.) Mr. Quinn testified that on at least two separate occasions, he sought out May's care, informed May that he was suffering from severe pain, and asked him questions about his health. (PSOF ¶¶ 14, 15.) May informed Mr. Quinn that he had reviewed his medical file. (PSOF ¶ 15.) Nevertheless, May released Mr. Quinn to the general population (PSOF ¶ 5; DSOF ¶ 5.) May refused to see or treat Mr. Quinn, despite Mr. Quinn's inquiries. (PSOF ¶¶ 14, 15.) He also made no efforts to connect Mr. Quinn with his follow-up appointment or an alternative outside provider. (PSOF ¶ 14.) Mr. Quinn has at least raised a question of fact as to whether May acted with deliberate indifference to the severe pain he was suffering, and the injuries that needed attention.

Similarly, Mr. Quinn has raised a question of fact regarding whether Defendant Lasak was deliberately indifferent to his serious medical condition. Despite Defendants' claims to the contrary, the evidence shows that Lasak worked closely with the nursing staff as well as Defendant Modi, made decisions regarding the grievances filed by Mr. Quinn, and, in Lasak's own words, worked to "ensure that policy and procedure were followed and to give general direction to the nursing staff." (PSOF ¶¶ 22, 23.); *see also Farmer*, 511 U.S. at 842 ("Whether a [defendant] had the requisite knowledge of a substantial risk [of serious harm] is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.") For example, the record specifically indicates that Modi was to "work with Nicole Lasak" to acquire his personal shoes, and that Lasak granted Mr. Quinn permission to use his personal shoes, but not

9

until June 21, 2017. (PSOF ¶¶ 22, 23) It further shows that Lasak allowed Mr. Quinn only a thicker mattress, despite his requests for an additional mattress. (PSOF ¶¶ 27, 28.)

Lastly, Defendants' position that Beatty's "only involvement" with the Plaintiff is responding to his grievances and that Beatty made "no medical decisions" for Mr. Quinn is without merit. Beatty's own deposition testimony reveals that in responding to Quinn's grievances, she was required to review his medical chart and history, and speak with his medical provider about Mr. Quinn's healthcare needs. (PSOF ¶ 21.) Mr. Quinn filed four grievances concerning his need for an additional mattress, the delay in receiving care from outside physicians, and the severe pain he was suffering from his injuries, which were left inadequately treated. (PSOF ¶¶ 19, 25, 30, 32.) His complaints were repeatedly denied and, as consequence, Mr. Quinn suffered extreme pain throughout the course of his time at Lake County.

A reasonable jury could infer from these facts that the Defendants were deliberately indifferent to Mr. Quinn's condition. The ongoing "care" Mr. Quinn received was plainly inadequate, and his frequent visits to see Defendant Modi and other Armor personnel are not enough to overcome this fact. *See* Defs.' Memo at 4 (citing *Boyce v. Moore*, 314 F. 3d 884, 888-89 (7th Cir. 2002)); *see also Sherrod*, 223 F.3d at 611-12 ("continuous medical treatment" was not sufficient in itself for defendant to prove it was not deliberately indifferent). Defendant Modi additionally argues that "[w]ithout any medical evidence of inadequate treatment, a prisoner's self-serving opinion of the quality of treatment is insufficient to raise a genuine issue of material fact." Modi's Memo at 14 (citing *Langston v. Peters*, 100 F.3d 1235 (7th Cir. 1996)). However, the defendant's "failure to respond to Langston's complaint" resulted in a mere one-hour delay. *See id.* at 1240. In holding that the defendants were not deliberately indifferent, the court noted that

the Seventh Circuit has held that a two-hour delay "is not an unreasonably long wait." *Id.* (citing *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995)).

This case is more similar to *Matzker v. Herr*, 748 F.2d 1142 (7th Cir. 1984). In *Matzker*, the plaintiff advised jail employees of his need for medical for his injuries, but was allegedly denied treatment for three months. *Id.* at 1147. When the plaintiff requested that he be transferred to a facility that could properly treat his injuries, his request was refused. *Id.* As a result, the plaintiff allegedly suffered pain for three months and sustained permanent physical injury and damage to his teeth and eye. *Id.* On these alleged facts, the Seventh Circuit held that the plaintiff stated a claim for denial of competent medical care. *Id.* at 1148.[1] Mr. Quinn waited approximately eight months to receive surgery, seven to receive a double mattress, and three to receive permission to use his personal shoes. Mr. Quinn suffered pain as a result of the Defendants' actions for far longer than two hours or a couple of days. *See Smith*, 666 F.3d at 1040 (few days' delay in addressing a severely painful but readily treatable condition constituted deliberate indifference). The evidence further demonstrates that Mr. Quinn responded well to surgery and physical therapy, as well as the accommodations he requested to relieve his nerve pain, demonstrating the harm caused by Defendants' delay. *See* Modi's Memo at 14 (citing *Langston*, 100 F.3d at 1240 (holding that plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed"); (PSOF ¶¶ 2, 31, 39.) Summary judgment is therefore improper, and the Defendants' motions should be dismissed.

---

[1] *Matzker* was overruled to the extent that it predated application of the deliberate indifference standard to due process claims. *See Salazar v. City of Chicago*, 940 F.2d 233, 240 (7th Cir. 1991). Nonetheless, *Salazar* clarified that because "jail authorities knew that *Matzker* had sustained serious injuries, yet ignored those injuries," even under a deliberate indifference standard, *Matzker* stated a due process claim. 940 F.2d at 240.

11

### B. Mr. Quinn Has Demonstrated That Armor Has a Policy, Custom, or Practice That Directly Caused a Violation of His Constitutional Rights

In seeking summary judgment on the basis of corporate status, Armor misapplies *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658 (1978). In order to recover against a corporate defendant under Section 1983, a plaintiff must prove that he suffered an injury as a result of an official policy or widespread practice. *Id.* at 690-91. Armor argues that Mr. Quinn has not shown that his "constitutional rights were violated by Armor's official policy or widespread custom or practice." Defs.' Memo at 10. But this is only one avenue for a plaintiff to demonstrate liability under *Monell*. Plaintiffs may do so against a corporate defendant either directly, by demonstrating that its policies are unconstitutional, or indirectly, by showing a series of bad acts which allows the court to infer that policymaking levels of government were bound to have noticed the conduct, "and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (internal quotation marks and citation omitted). A corporate defendant may also be liable when it is shown that it knows or should know that its employees are ignoring its written policies. *Id.* at 929.

First, Mr. Quinn has put forth evidence that Armor has a widespread practice of dismissing prisoner complaints as illegitimate, such as Mr. Quinn's, even if there is a medical basis or need underlying the request. For example, Defendant Lasak testified that there were "complaints about mattresses daily from everybody, whether they had a medical condition or not . . . Everybody wanted extra mattresses." (PSOF ¶ 19.) Similarly, Defendant Beatty testified that "[w]e got quite a few requests for mattresses." (PSOF ¶ 19.) Lasak further stated that she received other complaints as well: "Food complaints, shoe complaints, clothing complaints, medication complaints . . . anything under the sun complaints. So where would you like me to start?" (PSOF

¶ 19.) She also received complaints about the prison issued shoes, specifically that "[t]hey weren't comfortable. They didn't like them. They wanted something better." (PSOF ¶ 19.)

The Defendants rely entirely on Dr. Gable's testimony to support their contention that Armor does not make medical judgments based on budgets. *See* Defs' Memo at 10. However, Mr. Gable testified that he was "*not aware* of anything as far as reviewing for cost," that Armor "might bring it to the attention of corporate that their budget is going to be shot to hell that month because of medications," but that in working for Armor for 10 years, he had *personally* never seen an instance of medical care being denied based on costs." (DSOF ¶ 65; Pl.'s Resp. DSOF ¶ 65.) (emphasis added). Mr. Gable's personal opinion and awareness simply does not support the assertion that there is no genuine dispute as to whether Armor makes medical judgments based on costs.

Second, a reasonable jury could find that Mr. Quinn demonstrated corporate liability pursuant to the indirect avenue -- through a showing of repeated bad acts by the Defendants. To establish a pattern or practice under the indirect method, a plaintiff is not required to show that a municipality's (or its contractors') practices actually caused pain and suffering to inmates other than the plaintiff. *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006). Instead, a plaintiff need only provide evidence "tending to show a general pattern of repeated bad behavior." *Id.* at 694. A plaintiff can even show a widespread practice by presenting evidence of the defendant's repeated bad behavior as leveled against the plaintiff alone. *Id.* at 695.

For example, in *Watkins v. Ghosh*, No. 11 C 1880, 2014 WL 840949, at *7 (N.D. Ill. Mar. 4, 2014) the Court held that a reasonable jury could find that the plaintiff's doctors engaged "in a serious of bad acts" and thus deliberately indifferent to his serious medical condition because they continuously ignored the plaintiff's written requests for medical treatment. The court explained

13

that, based on the bad acts exercised solely against the plaintiff, a fact finder could infer that the defendant was "bound to have noticed, and subsequently encouraged" the behavior. *Id.* (internal quotations omitted). This was enough to support that the alleged constitutional violation "was a result of an existing policy, rather than an isolated incident." *Id.* (citing *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1071 (7th Cir. 2012)).

The evidence demonstrates that Armor's employees failed to follow corporate procedure. Specifically, the Armor policy requires that an inmate be seen by a clinician and receive requisite care in a timely manner, and that formal grievances be addressed within five days, and with a "face-to-face" interview. (PSOF ¶¶ 6, 20.) Mr. Quinn was forced to go months without being referred to outside specialists to address the loose hardware in his right elbow and nerve damage to his hand. (PSOF ¶¶ 16, 32, 37.) Armor has a process for connecting inmates with outside appointments upon medical necessity, and such appointments are to be set up "as soon as possible." (PSOF ¶ 10.) However, Mr. Quinn did not receive surgery until November 14, 2017, despite that he made numerous complaints during Sick Call visits and in the grievances filed concerning his chronic pain and need to be seen by an outside healthcare provider. (PSOF ¶ 37.) This behavior violated the manual setting forth Armor's healthcare policies, a fact sufficient to satisfy the Seventh Circuit's standard for deliberate indifference. *Woodward*, 368 F.3d at 930.

Furthermore, when an inmate undergoes recent surgery or has suffered wounds in relation to the surgery, the inmate is to be evaluated and determined whether he or she should be placed somewhere other than the general population. (PSOF ¶ 3.) Despite having been recommended for medical housing, Mr. Quinn was placed into the general population. (PSOF ¶¶ 3, 5.)

Mr. Quinn filed several grievances regarding the pain he suffered from sleeping on a single, thin prison mattress, yet each time, was informed in writing more than five days later that he did

not meet the "criteria" without further explanation. (PSOF ¶¶ 26, 34, 38.) From nowhere in the record can it be inferred that Mr. Quinn received a face-to-face interview to discuss with him the reasons for why an additional mattress to alleviate his chronic pain did not fall within the criteria. Perhaps if this occurred, Mr. Quinn would not have suffered the unnecessary pain caused by the mattress for several months. Ignoring Mr. Quinn's needs and requests many times over the course of several months demonstrates a general pattern of repeated bad behavior and violations of corporate policies, and further shows that Mr. Quinn's suffering was the result of a widespread practice, not an isolated incident. Thus, a reasonable jury could find that Armor's practices resulted in the violation of Mr. Quinn's Eighth Amendment Rights.

### V. CONCLUSION

For the foregoing reasons, Mr. Quinn respectfully requests that this Court deny the Motions for Summary Judgment submitted by Defendants Dr. John May, Allison Beatty, Nicole Lasak, Armor Correctional Health Services, Inc., and Miteshkumar Modi and their Memorandums in Support thereof.

Dated: March 6, 2020

Respectfully submitted,

GARY D. QUINN II
By: s/ Joseph C. Wylie

Joseph C. Wylie
Nora E. Becerra
K&L Gates LLP
70 West Madison Street
Suite 3100
Chicago, Illinois 60602
Tel.: (312) 807-4439
Joseph.Wylie@klgates.com
Nora.Becerra@klgates.com

*Attorneys for Plaintiff Gary D. Quin II*

15

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on this 6th day of March 2020, counsel for Plaintiff, Gary D. Quinn II served Plaintiff's Notice of Deposition for Armor Correctional Health Services, Inc. to the following counsel of record via email:

**Cassiday Schade LLP**
Matthew H. Weller
Ronald E. Neroda
222 West Adams Street
Suite 2900
Chicago, Illinois 60606
(312) 641-3100
mweller@cassiday.com
rneroda@cassiday.com

**Lewis Brisbois isgaard & Smith LLP**
Margaret Fitzsimmons
Charles Cole
550 W Adams St #300
Chicago, IL 60661
(312) 463-3444
margaret.fitzsimmons@lewisbrisbois.com
charles.cole@lewisbrisbois.com

By: s/ Joseph C. Wylie
One of Plaintiff's Attorneys