**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**GARY D. QUINN II,**
        **Plaintiff,**


        **v.**

**MITESHKUMAR MODI,**
**et al.,**
        **Defendants.**

Case No. 17-CV-05402

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff, Gary D. Quinn II (Quinn), was incarcerated at Lake County Jail from March 11, 2017 through the fall of 2017. During this time Quinn was suffering from nerve damage and other medical issues attributable to gunshot wounds he received in 2016. Several medical professionals at Lake County Jail treated or assisted Quinn, including Physician's Assistant Miteshkumar Modi (P.A. Modi), John May, M.D. (Dr. May), Medical Administrator Allison Beatty (Beatty), and Nurse Nicole Lasak (Nurse Lasak).[1] Each of these defendants, with the exception of P.A. Modi, was employed by Defendant Armor Correctional Health Services, Inc. (Armor), the jail's contracted healthcare provider and a co-defendant in this lawsuit. Quinn contends that each of these defendants acted with deliberate indifference towards his medical

---

[1] Nurse Lasak is at times referred to as a Physician's Assistant. (*e.g.* Dkt. 39, p. 1). She testified that she is a Registered Nurse with a master's degree and supervisory responsibilities as the Director of Nursing. (Dkt. 73, Ex. E, pp. 12, 14, 15, 17).

condition in violation of the Due Process Clause of the Fourteenth Amendment.[2] The defendants have filed motions for summary judgment. For the reasons stated below, P.A. Modi's motion for summary judgment (Dkt. 66) is granted in part and denied in part, and the Armor Defendants' motion for summary judgment (Dkt. 72) is granted.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323 (1986). After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). Moreover, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [their] favor." *White v.*

---

[2] Both the Plaintiff and the Defendants refer to the Eighth Amendment. Because Quinn appears to have been a pretrial detainee, the Fourteenth Amendment applies to his claims. *See Salazar v. City of Chicago*, 940 F.2d 233, 240 (7th Cir. 1991). The tests under the Eighth and Fourteenth Amendments for deliberate indifference with respect to medical care are the same: subjective recklessness. *Id.* at 239–40.

*City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White*, 829 F.3d at 841 (7th Cir. 2016) (citation omitted).

## **BACKGROUND**

The parties have agreed to these facts, unless otherwise noted.[3]

### **A. Relevant Pre-Incarceration Medical History**

Quinn suffers from chronic arm, hand, back, leg, and foot pain because of five gunshot wounds he sustained in September of 2016. (Dkt. 79, ¶¶ 6, 8). He underwent multiple surgeries (*Id.*, ¶ 8), including a colostomy and subsequent colostomy reversal, nerve repair, insertion of hardware into the elbow joint for stabilization, and a skin graft over that hardware. (*Id.*). Quinn's last reconstructive surgery was on January 11, 2017,[4] just two months before he was incarcerated. On February 7th, his surgical team evaluated him and advised him to return in one to two weeks. (Dkt. 79, Ex. C, p. 12).

### **B. Intake at Lake County Jail**

On March 11th Quinn completed an intake interview. (Dkt. 68, Ex. D, p. 5). Prior to his arrest, he had been taking Gabapentin (a nerve medication), Ibuprofen (a

---

[3] The Court refers to the following documents by their docket numbers: Plaintiff's Response to P.A. Modi's 56.1 Statements of Material Fact (Dkt. 79); Plaintiff's Response to 56.1 Statements filed by Armor Defendants (Dkt. 80); P.A. Modi's Reply to Plaintiff's 56.1 Statement of Additional Facts (Dkt. 87); Armor Defendants' Reply to Plaintiff's 56.1 Statement of Additional Facts (Dkt. 88).

[4] All dates occurred in 2017 unless another year is specified.

pain medication), and Norco (a pain medication made of Acetaminophen combined and an opioid). (*Id.*, p. 6). At this time Quinn was already wearing a foot brace for "drop foot" (nerve damage causing the front of the foot to drag), wearing a hand brace to correct for nerve damage, and using a cane. (Dkt. 79, ¶ 8; Dkt. 68, Ex. D, pp. 6, 9). The intake report described Quinn's "special health requirements" and requested a "relocation" within the facility to "bottom tier [of housing] no stairs." (Dkt. 68, Ex. D, p. 32). The report noted that Dr. May approved Quinn to continue using his own hand and foot braces, with jail-issued "worker shoes" for support rather than his own shoes. (Dkt. 79, Ex. B, p. 32).

### C. Medications

Quinn argues that he was at times improperly medicated for his pain. Beginning on March 11th, Quinn received Ibuprofen and Gabapentin.[5] (Dkt. 68, Ex. D, p. 105). As a supplement to those two medications, on April 20th Quinn began receiving a third daily medication, Methocarbamol (generic "Robaxin" (Dkt. 79, ¶ 18)), to treat muscle pain and spasms. (Dkt. 68, Ex. D, p. 120). He took Methocarbamol, Ibuprofen, and Gabapentin from April 20th through April 27th. A different daily pain medication, Naproxen (commonly known as Aleve), was substituted for the Ibuprofen on April 27th. (*Id.*, p. 114). On May 8th, Quinn began receiving Meloxicam (a steroid commonly used to treat arthritis) instead of Methocarbamol. (*Id.*, p. 116). This Meloxicam was taken daily alongside the Gabapentin and Naproxen for one month.

---

[5] These medications were prescribed by Dr. May over the phone upon intake on March 11th. (Dkt. 68, Ex. D, p. 32). Each of the medications were administered, some multiple times per day. (Dkt. 68, Ex. D). Various other medications, not relevant here, including vitamins, antidepressants, and antibiotics were also administered during this time period.

On June 8th, Methocarbamol replaced Naproxen in the daily rotation.[6] On July 10th, Quinn was once again put on Naproxen, and took a daily combination of Naproxen, Methocarbamol, and Gabapentin. (*Id*., p. 130). On September 10th, Quinn stopped taking Naproxen again. (*Id*., p. 147). He took only Methocarbamol and Gabapentin daily until his release, sometimes in combination with one of his two over-the-counter pain medications, Ibuprofen and Naproxen. (*Id*.)

### D. Requests for Referrals

Quinn argues that he was denied appointments with Dr. May, and with outside specialists.

On March 28th, Quinn asked to see his doctor in Milwaukee for necessary follow-up. (Dkt. 79, Ex. A, p. 37). P.A. Modi rejected this request but said Quinn could be seen by a specialist in Illinois. (*Id*.). No appointments with outside specialists were made at this time, however. (Dkt. 79, Ex. B, pp. 38–43).

On April 13th, Quinn complained to a nurse that his elbow gave him "chronic pain from gunshot." (Dkt. 68, Ex. D, p. 171). The nurse made a note that Quinn requested "to see Dr. May and does not want to see Modi." (*Id*.). On April 20th, Quinn again reported chronic back pain, arm and hand pain, and leg pain. He was told that "he needs to see P.A. Modi for a referral [to an outside specialist]." (Dkt. 68, Ex. D, pp. 44, 173).

---

[6] Quinn asserts that he did not receive pain medication between June 8th and July 10th. (Dkt. 79, p. 14). Quinn complained to Beatty that his medications were "stopping and starting". (Dkt. 68, Ex. C, p. 67). Quinn's medical records indicate, however, that while his medications were adjusted, he was never without them entirely. (Dkt. 79, Ex. B, pp. 105–68).

A week later, on April 27th, Quinn told a third nurse[7] his elbow was in "severe pain." (Dkt. 79, Ex. B, p. 174). This nurse contacted Quinn's outside care providers and verified that he had missed an appointment to remove the hardware in his elbow. (Dkts. 87 & 88, ¶ 11; Dkt. 79, Ex. B, p. 220). The nurse discussed Quinn's condition with P.A. Modi who agreed to "order orthopedic consult for right arm." (Dkt. 79, Ex. B, p. 220; Dkt. 79, ¶ 20; Dkt. 87 & 88, ¶ 11). However, there is no indication in the record that the referral was made at this time.[8] Instead, the section of Quinn's medical charts recording referrals contains no referral following this April 27 appointment.[9] (Dkt. 79, Ex. B, pp. 174–75). Another month passed before an appointment was scheduled with an orthopedist. On May 30th, an appointment was created for an outside orthopedic consult to take place on June 6th. (*Id.*, pp. 178–79). On June 6th, the consult was postponed until June 12th. (*Id.*).

On May 30th, Quinn saw P.A. Modi and asked about seeing Dr. May. (*Id.*, pp. 177–79). He was told that seeing Dr. May "requires a referral." (*Id.*, p. 177). No such referral was made, and Quinn did not see Dr. May. P.A. Modi also noted that Quinn was still "uncomfortable due to internal fixation in right elbow and had feeling of

---

[7] Armor Defendants argue that the records do not clearly establish that non-defendant nurses were employed by Armor. (Dkt. 88, ¶ 11). Even if true, a non-Armor nurses' notes on Quinn's chart would give rise to knowledge on the part of a defendant.

[8] With no support from the medical records, P.A. Modi asserts that Quinn's orthopedic consult was ordered on April 27 (Dkt. 86, p. 2) and then asserts that Quinn saw the orthopedist, Dr. Cavallero, on April 27th. (Dkt. 67, p. 10).

[9] Dr. May testified that "any appointments were logged into a schedule, and there would be a way to track from beginning of the consultation request to the completion of the appointment." (Dkt. 73, Ex. D, p. 49). Other consultation requests in Quinn's medical records had their own entry. (*See, e.g.,* Arista Referral created 5/27/17, Dkt. 173, Ex. B, p. 178). There is no similar entry on this date.

6

loose hardware." (*Id*., p. 162). Finally, P.A. Modi scheduled Quinn for his first outside appointment, an elbow X-ray. (*Id*., p. 177). That X-ray took place a few days later, on June 3rd.

On June 12th, Quinn saw Dr. Matthew Cavallero who reviewed his recent X-ray and noted "elbow joint effusion" with new bone formation and no acute fracture. (Dkt. 79, Ex. K, p. 7). Quinn had no ongoing restrictions since the fracture had healed, but Dr. Cavallero recommended he work on range of motion. (*Id*., p. 9). Formal therapy could result in continued improvement. (*Id*.) As to the hardware that was in Quinn's elbow, Dr. Cavallero noted that there was no breakage. (*Id*., p. 7). He did note that "clawing of [Quinn's hand]" was worsening, (*Id*.), and he provided Quinn with a "referral to ortho[pedic surgeon] for hand evaluation." (*Id*., p. 9; Dkt. 79, Ex. B, p. 50). He also recommended occupational therapy.

On July 10th, Quinn again complained to P.A. Modi about pain in his elbow, which still contained reconstructive hardware. (Dkt. 79, Ex. B, p. 239). P.A. Modi again referred Quinn to an orthopedic specialist for his elbow. (*Id*., p. 184).[10]

On August 18th, Quinn was seen for a final time by P.A. Modi. At that time Quinn reported that his still had nerve pain in his hand but denied having any new complaints. (Dkt. 79, Ex. B, pp. 188, 240). P.A. Modi told Quinn that he was awaiting

---

[10] Quinn submitted repeated requests for medical appointments throughout July and August. (Dkt. 79, Ex. B, pp. 183–92. He also submitted various grievances including one on August 10th that read "Allison Beatty, Nicole Lasak, and P.A. Modi have all been neglecting the fact that I need to go to an outside doctor." (Dkt. 79, Ex. H, p. 46). During that time, he was seen by P.A. Modi and various nurses for his nerve damage. Dr. Alvaro Encinas, the new Medical Director at Lake County Jail, did attempt to set an appointment with Quinn on August 1st, but Quinn was in court. (Dkt. 79, Ex. B, p. 239). On July 28th, Quinn filed another a grievance. (Dkt. 79, Ex. H, p. 52).

a call about a specialist referral. (*Id.*, p. 240). Sometime shortly after this visit, P.A. Modi's employment at Lake County Jail ended. (Dkt. 68, Ex. E, p. 82).

On August 21st, Quinn had his second appointment with Dr. Cavallero, the orthopedist. (Dkt. 79, Ex. B, p. 220; Dkt. 79, Ex. K, pp. 7–8). Following this visit, Dr. Encinas referred Quinn for an EMG test and a visit with a hand specialist. (Dkt. 79, Ex. B, p. 240).

On August 31st, Quinn was seen by Dr. Charles Wang, an outside neurologist who examined his right hand. (*Id.*, pp. 60, 220). This visit was followed by an appointment with Dr. Encinas to review Quinn's EMG results and refer him for further orthopedic care. (*Id.*, p. 191).

Throughout the fall Quinn continued to request medical care.[11] On October 6th, Quinn saw Dr. Robert Gray, an outside orthopedic surgeon, who recommended an endoscopic cubital tunnel release surgery on his right wrist. (Dkt. 79, Ex. B, pp. 65, 220; Dkt. 68, Ex. C, p. 51). Quinn met with Dr. Gray again on October 15th, for a pre-op physical. (Dkt. 79, Ex. B, p. 241). The surgery was scheduled for November 14th, and was completed after Quinn left Lake County Jail. (*Id.*, p. 221; Dkt. 68, Ex. C, p. 52).

---

[11] On September 6th, Quinn requested an increase in his Gabapentin dosage for "severe pain." (*Id.*, p. 62). A doctor at Lake County Jail (not named in this suit) informed Quinn that this would not be possible. (*Id.*). On September 20th, Quinn told a nurse that he was still experiencing pain, tingling, numbness, and swelling in the leg and foot. (*Id.*, p. 63). One week later, on September 28th, he returned to the health care unit reporting more numbness in his entire leg and exhibiting a limp. (*Id.*, p. 64). He was told to lay on his left side rather than his right, and to return if symptoms continued to worsen. (*Id.*). On October 2nd, Quinn told a nurse that his pain was worse, and that he was experiencing increasing numbness in his leg. (*Id.*, p. 241). In response to that complaint, his Gabapentin dosage was increased. (*Id.*).

8

Quinn testified about his repeated requests to see outside specialists. (Dkt. 68, Ex. C, p. 42). Quinn acknowledges that he did see outside specialists on several occasions, (*Id*., p. 44), but says that those visits didn't take place until "months and months" after he arrived at Lake County Jail. (*Id*., p. 45).

Quinn also testified that although he requested to see Dr. May, he never did. (*Id*., pp. 39–40). Quinn was, however, seen by Dr. Encinas, the Medical Director who was hired to succeed Dr. May. Dr. Encinas first attempted to see Quinn on August 1st, and saw Quinn several times in the fall. (Dkt. 79, Ex. B, pp. 240–42).

### E. Requests for Alternative Shoes

Quinn was provided with "worker shoes for support," to be worn with his foot brace. (Dkt. 79, Ex. B, p. 32). The problem with these work shoes, according to Quinn, was that they were too large, and they created an open sore across his right foot. (Dkt. 68, Ex. C, p. 92). Quinn recalls telling P.A. Modi at his first appointment in March of 2017 that the work shoes were not fitting his brace, and requesting his personal shoes. (Dkt. 68, Ex. C, p. 35). P.A. Modi remembers discussing this issue and denying the request because personal shoes were not permitted in the jail. (Dkt. 68, Ex. E, p. 48).

Quinn continued to request his personal shoes. On May 30th, P.A. Modi wrote in his notes that Quinn's care plan included "right shoe replacement." (Dkt. 79, Ex. B, p. 162). P.A. Modi also noted that an officer would work "to get new shoes without lace that [patient] [may] have in custody." (*Id*.).

On June 12th, Dr. Cavallero, the orthopedist, "request[ed] approval of personal shoes to which the brace was custom made. Modi PA notified, PA and HAS to discuss approval of personal shoes 6/13/17 AM [the following day]." (Dkt. 79, Ex. B, p. 50). The next day, a note in Quinn's chart indicates "personal shoes are *denied by provider,* patient to continue using inmate worker shoes." (*Id.*, p. 51) (emphasis added).

On June 16th, Quinn filed a grievance requesting "for my shoes that fit jail's policy and criteria to be allowed for me." (Dkt. 79, Ex. H, p. 58).

Quinn returned to the health care unit on June 18th and told a nurse that "walking in these [prison-issued] shoes make my foot swell up [*sic*]." (Dkt. 79, Ex. B, p. 54). In response to this complaint, three days later on June 21st, Quinn was permitted to wear "black slip-on gym shoes with his prosthetic ankle brace." (*Id.*, p. 55). This accommodation came more than three months after Quinn arrived at the Lake County Jail. On August 21st, Dr. Cavallero noted that Quinn "is now allowed to wear his shoes which has helped." (Dkt. 79, Ex. K, p. 8).

### F. Requests for Mattresses

About one week after he arrived at Lake County Jail, Quinn informed a nurse that his mattress was too thin and that it was causing him nerve pain. (Dkt. 79, Ex. A, pp. 52–54).[12] He asked for an additional mattress to alleviate that pain but was

---

[12] This interaction was not recorded in Quinn's medical charts. Both P.A. Modi and the Armor Defendants dispute whether Quinn actually made such a request, but at the summary judgment stage the Court does not make credibility determinations. *See McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). Quinn testified in his deposition that he asked for an additional mattress on this date. At this stage, the Court views the facts in the light most favorable to the Plaintiff and credits his recollection of their meetings.

not issued one at that time. (*Id*.). Quinn testified that other Lake County Jail inmates recovering from serious injuries were routinely issued additional mattresses. (Dkt. 68, Ex. C, p. 86). The deposition of an Armor administrator confirms that "the need for additional mattresses" is "something that is evaluated by the physician or the medical provider at the time to determine the medical necessity as such." (Dkt. 79, Ex. D, p. 40). Provided that correctional staff did not find the issuance of an extra mattress to be a security problem, the Armor administrator said that "within, I would think, 24 to 48 hours [another mattress] could be issued." (Dkt. 79, Ex. D, pp. 40–43).

On March 28th, Quinn had a medical appointment with P.A. Modi that included a full physical examination. P.A. Modi recorded Quinn's injuries, nerve damage, and request for an extra blanket for his foot. (Dkt. 79, Ex. B, p. 38-42). The next day P.A. Modi requested an extra blanket to support Quinn's foot. (*Id*., p. 42).[13] Quinn said in his deposition that during this appointment he also asked P.A. Modi for a second mattress.[14]

On June 16th, Quinn filed a grievance requesting a new mattress or a double mattress. (Dkt. 79, Ex. H, p. 58). In denying the grievance, Beatty noted that Quinn would "not be granted a double mattress by medical" because he did not meet the criteria. (*Id*., p. 57).

---

[13] Quinn received a blanket shortly after his first appointment with P.A. Modi. (Dkt. 68, Ex. C, p. 95). He used that blanket a few times a day for several months, to prop up his foot when it started swelling. (Dkt. 68, Ex. C, p. 96). After a few months, according to Quinn, the blanket was taken away. (*Id*.).

[14] P.A. Modi denies that Quinn requested an additional mattress on this date. The medical records do not contain any reference to it. Viewing the testimony and medical records in the light most favorable to the plaintiff, the Court accepts that Quinn made such a request.

On June 19th, P.A. Modi noted that Quinn was "asking for 2 mattresses." (Dkt. 79, Ex. B, p. 179).[15] Quinn's medical charts indicate that he again requested a second mattress on June 22nd. (*Id.*, pp. 55, 181). On that date, the nurse recorded that "per P.A. Modi" there would be no changes to Quinn's medical care at that time, but that he could "request a different mattress from the pod officer." (*Id.*).

A few days later on June 26th (prior to the denial of his first grievance), Quinn filed his second grievance about the failure to provide a second mattress "because of my medical condition." (Dkt. 79, Ex. H, p. 56). The response to that grievance dated June 28th said that "a new mattress request was submitted by medical staff to the jail staff." (*Id.*, p. 55). Quinn asked Nurse Cardona for a second mattress again on June 27th. (Dkt. 79, Ex. B, p. 183).

On July 10th, four months after he arrived at Lake County Jail, Quinn again complained to P.A. Modi about his mattress and his elbow pain, among other things. (*Id.*, p. 239). A note on Quinn's chart written by Nurse Lasak that same day says that "due to medical reasons, [patient will] be issued a new, thicker mattress or an extra blanket to be used for extra padding on current mattress." (*Id.*, p. 56).

The next day, on July 11th, Quinn's grievance appeal was denied because Quinn had been provided "a better" mattress. (Dkt. 79, Ex. H, p. 59).[16] He continued to

---

[15] This is the first time that a request for a second mattress is memorialized in Quinn's medical charts. However, on June 22nd Nurse Mellody Standiford noted Quinn "*has been requesting* a double mattress" (Dkt. 79, Ex. B, p. 55), and a grievance dated June 16th supports Quinn's testimony that he had already made these requests. (Dkt. 79, Ex. H., p. 15).

[16] In his deposition, Quinn says that although medical staff told him "they would try to get me a newer mattress," he "never received that as well." (Dkt. 68, Ex. C, pp. 80–81). Later in that deposition, however, Quinn says that he did receive a different kind of mattress "seven months after" first

request two mattresses. In a grievance dated July 28th, Quinn once again identified a second mattress as his "relief sought." (*Id*., p. 52). Eventually, according to a note in Quinn's medical file dated October 3rd, "Command request[ed] we allow patient to have double mattress. The quality of the jails [*sic*] current mattresses does not allow for them to furnish this patient with enough support for his issues." (Dkt. 79, Ex. B, p. 65).

## <u>ANALYSIS</u>

Claims can be brought under 42 U.S.C. § 1983 against any person (natural or legal) who, under color of state law, "subjects or causes to be subjected, any citizen of the United States [. . .] to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. A prisoner "must rely on prison authorities to treat his medical needs," and because "denial of medical care can result in pain and suffering" that serves no penological purpose, "deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain [which is] proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976) (quotations and citations omitted). The Fourteenth Amendment protects pre-trial detainees from deliberate indifference in the same manner. *See Salazar v. City of Chicago*, 940 F.2d 233, 240 (7th Cir. 1991).

Quinn has brought claims against both his individual healthcare providers, and the corporation that employed them. In order to survive summary judgment with

---

requesting an additional mattress. (*Id*., p. 58–60). And in a September 15th grievance Quinn requested that he be allowed to keep "my mattress" during a move from one pod to another, because it was "medically ordered for me." (Dkt. 79, Ex. H, p. 32).

respect to the individuals, Quinn must demonstrate both that (1) he suffered an objectively serious medical condition; and that (2) the individual defendants (a) were subjectively aware of a risk to his health and (b) consciously disregarded that risk. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).[17] In order to survive summary judgment with respect to the corporate defendant, Armor, Quinn must demonstrate both that it maintained unconstitutional policies or practices, and that those policies or practices were the cause of his injuries. *See Monell v. Dept. of Social Servs. of the City of New York*, 436 U.S. 658, 690–91 (1978); *Dixon v. Cnty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016).

### A. Individual Defendants

Defendants do not dispute that Quinn suffered an objectively serious medical condition, and the first prong of the test is satisfied. The second prong of the test for deliberate indifference requires both that the defendant (a) actually knew of and (b) consciously disregarded a substantial risk to an inmate's health. *See Petties*, 836 F.3d at 728; *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Together, these two requirements amount to criminal recklessness. *See Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994). A "showing [of] mere negligence is not enough." *Salazar*, 940 F.2d at 238; *Farmer*, 511 U.S. at 836. And "even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim." *Petties*, 836 F.3d at 728 (citation omitted). So

---

[17] The Armor Defendants describe a three-part test rather than a two-part test, but the difference is semantic, with subjective awareness and a culpable mental state being considered together in the two-part articulation and separately in the three-part articulation.

defined, deliberate indifference "implies at a minimum actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent harm can be inferred from the defendant's failure to prevent it." *Duckworth v. Franzen*, 780 F.2d 645, 651 (7th Cir. 1985). The requisite mental state "*approaches* intentional wrongdoing," *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015) (emphasis added), but Quinn does not need to show that the defendants "intended harm or believed that harm would occur" *Petties*, 836 F.3d at 728.

1. <u>Nurse Lasak</u>

Nurse Lasak was employed by Armor as the Director of Nursing at Lake County Jail from June of 2015 through August of 2017. (Dkt. 73, Ex. E, p. 17). This included most of Quinn's time at the jail, which lasted from March of 2017 through October of 2017. Hers was "an administrative role" involving "general oversight of the medical unit," (*Id*., p. 26), and direct oversight of the nursing staff. (*Id*., p. 29).

Nurse Lasak does not remember treating Quinn and testified that where her name appears on his charts it indicates she completed a task on his behalf. (*Id*., p. 59). According to Quinn they met only three or four times in the health unit where Quinn, while waiting to see P.A. Modi or requesting to see Dr. May, might call her over. (Dkt. 68, Ex. C, p. 71). According to Quinn, she did examine his leg on one occasion. (*Id*.).

Quinn argues that Nurse Lasak provided him inadequate medical care by denying his requests for an additional mattress and for his personal shoes; Quinn faults her for telling him that the decision was one for the corrections staff. (Dkt. 68,

Ex. C, pp. 69–70; Dkt. 78, p. 9–10). Nurse Lasak testified that her role was as a go-between, "present[ing] whatever the medical provider said was appropriate for the patient to have, and then [the chief of security] has the ultimate authority over what is safe to be in the jail." (Dkt. 73, Ex. E, p. 34). This applied to the shoes and the mattress. (Dkt. 73, Ex. E, p. 36). Quinn's belief that Nurse Lasak had some hand in denying him care is speculation and contradicted by the evidence.[18]

Based on this uncontested description of her role and her interactions with Quinn, it does not appear that she provided any medical care to him or denied him any medical care. She relied on P.A. Modi to make recommendations, then passed on his recommendations. No reasonable jury could find that Nurse Lasak was deliberately indifferent to Quinn's serious medical conditions.

### 2. Dr. May

Dr. May's role at Armor was to "provide coverage," at correctional facilities that didn't have a doctor on-site. (Dkt. 73, Ex. D, p. 12). Much of this "coverage" was done over the telephone because he lived in Miami, Florida. (*Id.*, pp. 12–13, 16). With respect to Lake County Jail, Dr. May recalls providing coverage for about six months after the on-site Medical Director resigned, until Dr. Encinas was hired. (*Id.*, pp. 14, 34). During that time, Dr. May "would try to get there at least once a month for one or two days, and just provide whatever support the site asked me to." (*Id.*, p. 33). During that entire time, the "full-time provider" was P.A. Modi. (*Id.*). On his visits to

---

[18] For example, Quinn's chart contains a June 21st note by Nurse Lasak saying that Quinn had been "granted permission per jail admin for use of one pair of black slip on gym shoes with his prosthetic ankle brace." (Dkt. 79, Ex. B, p. 55).

Lake County Jail, Dr. May testified that he would "review maybe a dozen [. . .] patients just at random." (*Id.*, p. 41).

Dr. May did not remember treating Quinn in person, although he acknowledged that his own name does appear on several pages of Quinn's medical records. (*Id.*, p. 38). He testified that "[i]f I saw him in a clinical encounter, it would have been documented in the medical record." (*Id.*, p. 52). According to Dr. May, he played no role in creating Quinn's health plan. (*Id.*, p. 56). Quinn, on the other hand, says that he tried to speak with Dr. May on three occasions when he was in the health care unit, but that Dr. May refused to speak to him. (Dkt. 68, Ex. C, pp. 40–41). Quinn says Dr. May was once called in to briefly examine Quinn's arms during an appointment with P.A. Modi. (*Id.*). According to Quinn, their other two interactions took place in the waiting area of the health care unit. (Dkt. 68, Ex. C, pp. 43–44). Quinn tried to speak with Dr. May on these occasions, but Dr. May ignored his requests. (*Id.*).

When asked about notes in Quinn's medical charts indicating that he wanted to see Dr. May instead of P.A. Modi and that such an appointment would require a referral, Dr. May said that Quinn's requests were not brought to his attention (*Id.*, p. 53). Dr. May testified that Armor "didn't have a process for a formal referral to see me" and that all a provider needed to do was put Quinn in an "electronic queue" to be seen by the doctor. (*Id.*, p. 54). Moreover, Dr. May did not recall ever having been shown a grievance authored by Quinn. (*Id.*, p. 62).

No reasonable jury could find that these brief interactions gave Dr. May knowledge of a serious risk to Quinn's health or demonstrated conscious disregard of such a risk.[19]

### 3. Health Administrator Beatty

Allison Beatty was a Health Service Administrator at Lake County Jail, where she handled "financial matters, budgets, hiring, [and] recruiting" among other things. (Dkt. 73, Ex. G, p. 12). P.A. Modi and other medical staff were supervised by Beatty "[i]n terms of day-to-day reporting," but not with regard to medical decision-making. (Dkt. 68, Ex. E, p. 39).

In that role, she would discuss medical grievances with P.A. Modi and other healthcare providers. (Dkt. 73, Ex. G, p. 13). When reviewing a medical grievance, she would also "look through the medical chart." (*Id.*). Unlike the other defendants in this case, Beatty testified in her deposition that she *did* recall Quinn's name, likely because "inmates who file a lot of grievances leave a little lasting memory." (*Id.*, p. 14). For example, it was Beatty who responded to Quinn's grievance, saying he did not meet the criteria for a second mattress. Beatty reviewed and responded to those grievances after discussing them with the healthcare providers. (*Id.*, pp. 19–20). Quinn also states in his deposition that Beatty visited his cell on two occasions, and that they discussed both his medications and his mattress request. (Dkt. 68, Ex. C, p. 63). Therefore, she had knowledge of Quinn's health problems, the treatment he

---

[19] Dr. May's only other interactions with Quinn's treatment were telephonic approvals of prescriptions and, upon intake, authorizing his right hand/wrist brace, right ankle brace, and jail-provided worker shoes for support. (Dkt. 73, Ex. D, pp. 44–47).

needed, and the treatment he was actually receiving. Beatty was not, however, a medical provider herself. She could not make medical decisions for patients at Lake County Jail or deny them care. (Dkt. 73, Ex. G, p. 29).

There is nothing in the record to suggest that she ignored grievances, failed to investigate grievances, or failed to respond to grievances. Merely denying grievances, after having adequately investigated them, does not constitute deliberate indifference. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1995); *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002); *Johnson v. Doughty*, 433 F.3d 1001, 1005 (7th Cir. 2006) (prison officials whose interactions with plaintiff were "limited to dealing with his grievances and other complaints about the hernia treatment [. . .] were not deliberately indifferent to that need because they took [the plaintiff's] medical complaints seriously and reasonably relied upon the doctors' recommendations in handling [the plaintiff's] condition"). No reasonable jury could conclude, based on the evidence presented, that Beatty's denial of Quinn's grievances, based on a medical professional's reassurances that reasonable care was being administered, constituted deliberate indifference.

4. <u>P.A. Modi</u>

P.A. Modi argues that the Court must consider the "totality of [an] inmate's care" and that a "pattern of neglect must be evident in the record," *Dunigan v. Winnebago County*, 165 F. 3d 587, 591 (7th Cir 1999). This is true, but Quinn is also correct to argue that "a prisoner is not required to show that he was literally ignored." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (internal quotation marks and

citation omitted). Moreover, even "continuous medical treatment" is not sufficient for a defendant to prove that they were not deliberately indifferent. *Sherrod v. Lingle*, 223 F.3d 605, 611–12 (7th Cir. 2000).

a. Referral to orthopedist

Quinn asserts that P.A. Modi caused delays in his treatment.[20] Delay of necessary treatment that aggravates an injury or needlessly prolongs an inmate's pain has been found to constitute deliberate indifference. *See, for example, Gomez v. Randle*, 680 F.3d 859, 865–66 (7th Cir. 2012) (a four-day delay in treatment could give rise to actionable deliberate indifference claim where it caused "prolonged, unnecessary pain"). But "the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1039–40 (7th Cir. 2012).

Because of his arrest, Quinn missed post-surgical follow-up appointments. It took two months (March 28th to May 30th) before an appointment with an orthopedist was scheduled by P.A. Modi. During this time Quinn told the healthcare providers that his elbow hardware should have been removed and was causing him severe pain on April 13th, April 20th, April 27th, and May 8th. However, at the appointment, the

---

[20] Quinn also argues that he was denied proper medication. The Court finds that he has not raised a triable issue of fact with respect to his medication. Quinn always received Gabapentin for nerve pain. Quinn was also given medications to treat muscle pain and spasms, steroids for nerve inflammation, and prescription as well as over-the-counter pain medications. Although there was a one-month period (June 8th through July 10th) during which Quinn did not receive either of his usual over-the-counter pain medications (Ibuprofen or Naproxen), he was receiving Meloxicam, Methocarbamol, and Gabapentin during that time. These are all medications that are used to treat nerve damage and the associated pain. (Dkt. 68, Ex. E, p. 39; Dkt. 73, Ex. D, p. 47). Nothing in the record suggests that P.A. Modi denied Quinn any medications that would have been more effective than what he was given. "Mere disagreement with doctor's medical judgment does not amount to deliberate indifference." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

orthopedist determined that the elbow fracture had healed and the hardware was intact. The orthopedist recommended range of motion exercises and more extensive treatment, including possible surgery, for Quinn's hand pain.

The Seventh Circuit has determined that a wide range of delays are actionable as deliberate indifference. Short delays are actionable if the injury is acute depending on the relative ease of providing treatment. *See, for example, Smith*, 666 F.3d at 1039 (failure to treat injuries from a fight including dizziness, blind spots, and bleeding for five days); *Gomez*, 680 F.3d at 866 (four-day delay in treating shotgun pellet wounds); *Conley v. Birch*, 796 F.3d 742, 744 (7th Cir. 2015) (fractured hand not x-rayed for several weeks); *Sherrod v. Lingle*, 223 F.3d 605, 609 (7th Cir. 2000) (two-week failure to correctly identify symptoms of appendicitis); *Petties*, 836 F.3d at 730 (court found that no specialist treatment of Achilles tendon rupture for two months while condition worsened was actionable even after noting that "delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment").

Less serious ailments can be actionable when the delay is especially long. *See Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (a twenty-eight month wait to see a specialist about vomiting and heartburn); *see also Watkins v. Ghosh*, No. 11 C 1880, 2014 WL 840949, at *4 (N.D. Ill. Mar. 4, 2014) (denying summary judgment because a prisoner with a herniated disk was denied access to his MRI results for two years).

In evaluating this two-month delay for a referral to an orthopedist, the Court is aware that the injury caused significant pain. Quinn's elbow had been fractured by

a gunshot wound. However, his condition was not acute; it was not changing or worsening. When he did eventually see an orthopedist, Quinn was prescribed occupational therapy exercises and referred to an orthopedic surgeon for his hand pain. No immediate relief came from the appointment. His challenge at that point was pain management, for which P.A. Modi and the other defendants were prescribing medication.

Quinn's injury is closer to the facts in *Watkins v. Ghosh*, 2014 WL 840949, at *4 (N.D. Ill. Mar. 4, 2014), where the plaintiff suffered from a bulging disc, than to the facts in *Petties*, 836 F.3d at 730, where the plaintiff suffered an Achilles tendon rupture. In *Petties*, the court found that a delay in treatment for 2 months was actionable, but in *Watkins,* the required delay was much longer, 2 years.

P.A. Modi agreed that a referral was appropriate on March 28th, and noted on April 27th that an orthopedic consult would be ordered. He offers no explanation why he did not make the referral at that time. That said, given the state of Quinn's elbow injury at that time of these events and the relevant case authority, P.A. Modi's delay—all the while prescribing Quinn pain and anti-inflammatory medication—does not constitute criminal recklessness. Taking all these factors into account, a reasonable jury could not find that there was deliberate indifference from the delay in referring Quinn to an orthopedist.

Quinn also claims he was denied a referral to Dr. May. As Dr. May clarified in his deposition, that kind of consultation does not require a referral, only a request from P.A. Modi or another care provider. But because Quinn is not entitled to choose

his care provider, P.A. Modi's decision not to seek the assistance of Dr. May was not an unconstitutional denial of care.[21]

### b. Requests for Alternative Shoes

Quinn asserts that P.A. Modi was deliberately indifferent to his medical needs when he delayed approving medically appropriate shoes to be worn with his brace. On March 28th, Quinn told P.A. Modi that his shoes were not properly fitted to his brace causing open sores on his foot. P.A. Modi declined to recommend Quinn's personal shoes. On May 30th, after several more complaints, P.A. Modi noted in Quinn's chart that his care plan included attempting to get better shoes approved. Based on the record, P.A. Modi did not follow-up on this. Rather, on June 12th Dr. Cavallero, the orthopedist, recommended a change in shoes. Quinn's medical records from that date say "Dr. Cavallero requesting approval of personal shoes to which the brace was custom made. Modi PA notified, PA and HAS to discuss approval of personal shoes 6/13/17 AM [the following day]." (Dkt. 79, Ex. B, p. 50). P.A. Modi again denied the request, despite Dr. Cavallero's recommendation, the next day. (*Id.*, p. 51; Dkt. 88, p. 3). On June 16th, Quinn filed a grievance requesting "for my shoes that fit jail's policy and criteria to be allowed for me." (Dkt. 79, Ex. H, p. 58). On June 21st, Quinn was permitted to wear shoes better fitted to his brace.

---

[21] Quinn's amended complaint raises a delay in being referred to an outside specialist to address nerve damage in his hand. (Dkt. 12, ¶ 20). Quinn's first appointment with a neurologist took place on August 31st. The record on this point is not developed and there is little more than a sentence of argument dedicated to it. (Dkt. 78, pp. 1, 14). The argument is waived. "It is not the obligation of [the] court to research and construct the legal arguments open to parties, especially when they are represented by counsel [. . .] Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority." *Riley v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018) (internal citations and quotations omitted).

This three-month delay caused Quinn significant and ongoing pain. It was not life threatening, but it was serious and is well documented in Quinn's medical records. It was easily treated with the proper shoe. Dr. Cavallero noted in Quinn's medical chart that once Quinn could use proper shoes, his condition improved, providing verification that Quinn did in fact suffer a detriment from being denied his shoes. It also appears, based on the ease with which security cleared his shoes, that this pain was unnecessary. P.A. Modi offers no explanation for not addressing this medical need. Therefore, a reasonable jury could find deliberate indifference based on this delay.

    c. <u>Request for Additional Mattress</u>

Quinn's deposition testimony and medical records indicate that he asked P.A. Modi for a mattress on March 28th, May 30th, June 22nd, and July 10th. (Dkt. 79, Ex. B, pp. 38, 179, 181, 239). At their first appointment on March 28th, P.A. Modi did not approve a second mattress for Quinn, but the next day he did make arrangements for an extra blanket to serve a similar purpose. (*Id.*, p. 42). This treatment decision was not "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). The Constitution does not require that Quinn receive either "specific care [or] the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). No evidence has been introduced to suggest that the alternative cushioning that P.A. Modi provided at their first appointment was not medically reasonable. As Quinn continued to experience pain, he was eventually given a thicker mattress and

24

then a second mattress. There is no evidence in the record that it was not medically reasonable to provide these accommodations sequentially.

### B. Armor, the corporate Defendant

Quinn argues that several of Armor's corporate policies or practices violated his constitutional rights. First, he argues that there is a "widespread practice of dismissing prisoner complaints as illegitimate [. . .] even if there is a medical basis or need underlying the request." (Dkt. 78, p. 12). He attributes this to making "medical judgments based on budgets." (Dkt. 78, p. 13). Second, Quinn asserts that a "general pattern of repeated bad acts," even if those bad acts were all directed towards one person, is enough to demonstrate that the corporate defendant was "bound to have noticed, and subsequently encouraged" such violations. (Dkt. 78, p. 13). Each of these arguments is evaluated in turn.

### 1. <u>Dismissal of Legitimate Prisoner Complaints for Budgetary Reasons</u>

Quinn asserts that there was a widespread policy or practice of dismissing legitimate complaints as illegitimate. In support of this argument he relies on the deposition testimony of Nurse Lasak, Beatty, and Dr. Gable. Accepting this testimony as true and representative of the general practice at Armor, it does not suggest that legitimate complaints were dismissed.

Nurse Lasak testified that there were "complaints about mattresses daily from everybody, whether they had a medical condition or not [. . .] Everybody wanted extra mattresses." (Dkt. 73, Ex. E, p. 12). Similarly, Beatty testified that "[w]e got quite a few requests for mattresses." (Dkt. 78, p. 12).

While this record shows that Armor received a wide range of complaints with some frequency, it does not establish how many of those claims were denied, or how many of those claims had merit. Neither Nurse Lasak nor Beatty stated or implied that they ever dismissed legitimate claims, especially those with a medical justification.

Moreover, Quinn has not presented any evidence that Armor was denying care or dismissing legitimate complaints on the basis of cost. Dr. Thomas Gable, the Utilization Management Director and Chief Medical Director for the State of Florida, provided deposition testimony as Armor's Rule 30(b)(6) representative. (Dkt. 79, Ex. D). Dr. Gable testified that an Armor employee "might bring to the attention of corporate that their budget is going to be shot to hell that month because of medications". (Dkt. 79, Ex. D, p. 57). But he did not testify or imply that Armor responded by denying care to cut costs. To the contrary, Dr. Gable testified that he had never seen care denied on the basis of cost. (*Id*.). This record does not raise a question of fact as to whether Armor *ever* denied constitutionally necessary healthcare or dismissed complaints about unconstitutional care on the basis of cost, much less suggest that there was a widespread pattern or practice of denying care or dismissing valid complaints.

2. Pattern of Bad Acts

Quinn next argues that Armor employees engaged in a series of repeated bad acts which the corporation itself was "bound to have noticed, and subsequently encouraged." *Watkins v. Ghosh*, No. 11 CV 1880, 2014 WL 840949, at *7 (N.D. Ill.

Mar. 4, 2014); *see also Woodward v. Corr. Med. Servs. of Ill, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004). Quinn cites *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006) for the proposition that if a series of bad acts are directed towards the plaintiff, he need not provide any evidence that other inmates were similarly affected. Quinn points to Armor's (i) failure to provide visits with specialists in a timely manner, (ii) failure to address formal grievances within five days, (iii) failure to meet with Quinn face to face to discuss grievances, and (iv) failure to place Quinn in medical housing after his surgeries.

Quinn's circumstances differ significantly from the facts in the cases he cites. In *Watkins*, the plaintiff presented evidence of a prison-wide audit which had revealed "significant policy lapses in the medical department." *Watkins v. Ghosh*, No. 11 C 1880, 2014 WL 840949, at *1 (N.D. Ill. Mar. 4, 2014). The court determined that this audit would have alerted the corporate defendant to the understaffing of the medical unit, failure to comply with its own policies, and failure to refer patients for off-site care. *Id.* at *7. In this case there was no audit to alert Armor to any alleged policy lapses. Moreover, in *Watkins* the court found multiple "subordinate officers" of the corporate defendant (a doctor and a P.A.) deliberately indifferent, because they had completely ignored numerous written requests for treatment from the plaintiff and provided the plaintiff with no treatment at all. *Id.* at *4. Here, no Armor employees were deliberately indifferent, all of Quinn's written grievances were responded to, and he received medication for his injuries while waiting for other

treatment. Therefore, there was no reason for Armor to have been on notice if something was amiss.

The same is true of *Woodward*. In that case, a deceased detainee's mother sued Lake County Jail doctors and their corporate employer (not Armor) for failing to prevent her son's suicide. The Seventh Circuit upheld a jury verdict for the plaintiff because the record clearly demonstrated that the work environment was "lax" and "unprofessional". *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 922 (7th Cir. 2004). One nurse testified that she was encouraged by her supervisors to disregard policies and procedures, that medical personnel were instructed to deny costly care "until [inmates are] at the point of imminent death," and that medical personnel worked while under the influence of drugs and alcohol. *Id.* at 923. Nurses stated that they had reported these issues to their supervisors and to regional directors of the corporate defendant. *Id.* The facts in *Woodward* were so egregious that the corporation was "on notice" that there was a "substantial risk that [the decedent] would be deprived of necessary care in violation of his Eighth Amendment rights." *Id.*, at 927–28. Here, no employees of Armor testified that they or their coworkers were allowed or encouraged to violate corporate polices and best practices.

No evidence in the record suggests that Armor lacks policies to deal with requests for mattresses, shoes, or specialist care. In fact, Dr. Gable's deposition testimony indicates that they have such polices. Moreover, no evidence points to widespread failures to comply with these policies. While it is true that to support a *Monell* claim Quinn need not "identify [ ] other incarcerated individuals" who suffered

the same *injuries* as he did, he must identify "bad acts" by Armor employees other than those directed towards himself. *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006). He has failed to do so.

## CONCLUSION

For the aforementioned reasons, the Armor Defendants' motion for summary judgment (Dkt. 72) is granted. P.A. Modi's motion for summary judgment (Dkt. 66) is granted in part and denied in part.

E N T E R:

Dated: November 23, 2020

_____
MARY M. ROWLAND
United States District Judge